{¶ 91} I concur in judgment with the lead opinion but write separately regarding the Widders, because I reach my decision by a somewhat different route. There are two breaches of loyalty alleged here: first in filing an application for guardianship and second in disclosing confidential information. I find no malpractice based on either claim.
 {¶ 92} I do not see a basis for a malpractice claim in the Widders' filing of an application for guardianship. Such an application merely initiates a case. This filing in itself does not automatically prejudice or damage a client. Indeed, the dissent explained that probate court could sua sponte file an application. "When found necessary, the probate court on its own motion * * * shall * * * appoint a guardian * * *." R.C.2111.02(A). More
 {¶ 93} importantly, the disciplinary code does not expressly prohibit an attorney from filing such an application, although attorneys might well consider the less conflicted alternative of contacting Adult Protective Services instead.
 {¶ 94} A task force appointed by Chief Justice Moyer has recently published its revisions to proposed rules to modernize Ohio's ethics rules and replace the current Code of Professional Responsibility with a form of the ABA's Model Rules of Professional Conduct. As of June 2004, the proposed rule regarding clients with diminished capacity would reaffirm the requirement that a lawyer, "as far as reasonably possible, maintain a normal client-lawyer relationship." However, the proposed rule, which tracks the Model Rules, further specifies that the lawyer may take "reasonably necessary protective action * * * including seeking the appointment of a guardian adlitem, conservator or guardian." For such an action, the proposed rule states three conditions: "When the lawyerreasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken, and cannot adequately act in the client's own interest."
 {¶ 95} The proposed rule, furthermore, would "impliedly" authorize the lawyer under another proposed rule "to reveal information about the client, but only to the extent reasonably necessary to protect the client's interest." Proposed Rule 1.14. Following the proposed rule are comments which clarify that "[w]hen taking protecting action [as described above], the lawyer is impliedly authorized to make the necessary disclosures, even when the client directs the lawyer to the contrary. * * * The lawyer's position in such cases is an unavoidably difficult one." This proposed rule and comments track the ABA Model Rules of Professional Conduct. The Task Force further observed: "There are no Disciplinary Rules that cover directly the representation of a client with diminished capacity." The proposed rules, along with the Model Rules, therefore, specify an exception for an attorney seeking the appointment of a guardian for a client, as well as for revealing limited information.
 {¶ 96} Ohio's current disciplinary code, moreover, is not inconsistent, I believe, with the proposed rule. This rule does not prohibit a lawyer taking protective action and under that action disclosing confidential information under limitations. The proposed rule is merely more explicit in permitting such actions. Also noteworthy is that over forty states have adopted the Model Rules, although "[n]o state has adopted the Model Rules in their entirety." Frequently Asked Questions, Supreme Court Task Force on Rules of Professional Conduct (as of June 22, 2004). Although a violation of the Code of Professional Responsibility is not, in itself, a form of legal malpractice, the Code sets a background against which legal practice is understood. To understand that practice in Ohio, one need not ignore more explicit rules widely adopted in other states, as well as proposals recommended by a Task Force of the Ohio Supreme Court and currently pending.[1] As the Task Force stated, "The Supreme Court often cites to the Model Rules in disciplinary opinions and has relied on the Model Rules for many recent revisions to the Ohio Code of Professional Responsibility." Frequently Asked Questions, supra.
 {¶ 97} From that background, I conclude that the disciplinary code does not establish an absolute duty that prohibited the Widders from filing, without the permission of Kutnick, an application for guardianship. I therefore disagree with the dissent because I believe its reading of the current code, specifically DR 7-101, is too limited for the purpose of establishing a violation of a duty of loyalty on the facts here and thus a basis for a malpractice action regarding the Widders' filing an application.
 {¶ 98} Also relevant is the statement by Kutnick's counsel, made at the hearing in which Probate Court appointed a guardian on March 29, 1995. Her counsel stated: "in the best interest of my client, I think that a guardian of the estate ought to be appointed in this case, at least long enough to put the financial affairs of the estate back in order and to protect my client's assets." Tr. at 4. There is no evidence to indicate the Widders were not acting to protect Kutnick's interests.
 {¶ 99} I further note that even if the Widders had chosen the alternative of referring the matter to Probate Court or to Adult Protective Services, then the costs of the proceeding,[2]
including attorney fees, the examining physician's fees, and the court reporter's fees, would still have occurred. Thus the costs could not automatically be attributed to the Widders as damages caused by their action if those costs would have accrued even if the application had been made by Adult Protective Services, a county agency whose purpose is to protect vulnerable adults or by Probate Court motion. Without those damages, there can be no claim for legal malpractice.[3] The concession by Kutnick's attorney as to the need for a guardian for her estate further supports there would be no damages since the costs for the hearing presumably would have been the same no matter who applied for guardianship.
 {¶ 100} The second breach Kutnick claims is that the Widders disclosed confidences. In her motion for summary judgment below, however,
 {¶ 101} Kutnick does not cite any specific confidences the Widders revealed at the guardianship hearing. In her motion for summary judgment in the trial court, she states, "[i]t is apparent from the depositions of the Widders that everything that they knew about Diane Kutnick, her concerns, her fears, her living conditions, etc. that they asserted to be a basis for her guardianship over her was learned by them during the course of their representation of Kutnick. They specifically represented her in competency issues in the expunged involuntary commitment proceedings that included the hearing on July 22, 1994 (Widder Dep. Ex. 19). They specifically represented her in housing matters related to the condition of her home. (J. Widder Dep. pp. 37, 43; Widder Dep. Ex. 4)." Plaintiff's Motion for Summary Judgment at 8.
 {¶ 102} This is the same argument Kutnick makes in her appellate brief. Both briefs, however, fail to specifically support the claim of breached confidences by citing precisely what revealed information was confidential.
 {¶ 103} Kutnick alleges only broadly, however, that the Widders breached their obligation to preserve her confidences because they gained their knowledge of her through their representation of her. Much of the evidence of Kutnick's illness, however, was clearly apparent to anyone observing her. The condition of the house, for example, was not confidential as was shown by exhibits the Widders included in their deposition. One exhibit was a letter from a cleaning service which stated that it had "never seen a house in such a bad condition." Deposition of Widders and Klein, Plaintiff's Exhibit 5. If the cleaning service saw the house and stated that it was filthy, then this information is not confidential.
 {¶ 104} Additionally, the exhibits include letters from Widder to the Beachwood police chief requesting and then acknowledging receipt of numerous police reports and complaints about Kutnick. Anything that occurred which required police intervention would not be confidential information. Moreover, the letters were sent after the Widders were discharged on July 28, 1994. These letters are dated Dec. 20, 1994 and Jan. 5, 1996. (Exhibits 40 and 41.)
 {¶ 105} In her reply brief to the Widder's motion for summary judgment, Kutnick cited the incident in which the police broke into her house at the urging of her psychiatrist because he feared for her safety. Reply brief at 2. Again, if the police were present, the incident was not confidential.
 {¶ 106} The dissent argues that the Widders allegedly induced Dr. Fisher into providing the physician's certificate for their application for guardianship as to the certificate. Because this allegation is not found in either Kutnick's trial motions or briefs below, this issue must be deemed waived. Nor is this claim articulated in her appellate brief. Neither side indicated the circumstances that prompted Dr. Fisher to provide the written
 {¶ 107} physician's certificate, so the record is devoid of facts to support inducement or persuasion as to the certificate. There is no evidence that Dr. Fisher produced the physician's certificate at the Widders' request as Kutnick's counsel.
 {¶ 108} His earlier assessment that she needed to be committed indicates he had independently arrived at a decision. Nothing in his deposition indicates that Dr. Fisher was induced or encouraged to provide the certificate. Rather, it appears that he agreed a guardianship was needed.
 {¶ 109} Further, the Widders did not deceive Dr. Fisher concerning their representation of Kutnick at the time theyfiled the application, because when he examined her for this certificate, on July 23, 1994, the Widders still represented her. Although Dr. Fisher did not complete the affidavit until after the Widders were discharged, nothing in evidence indicates that he executed it for the Widders as counsel. Rather, the evidence shows he executed it because he felt it was necessary for the guardianship to go forward.
 {¶ 110} The actual affidavit Dr. Fisher executed for the guardianship hearing also was not induced deceptively. Although he did not know at the time he executed the affidavit that the Widders no longer represented Kutnick, this fact is of no consequence. Dr. Fisher was required to respond to the subpoena and he submitted the affidavit in lieu of being present for testimony. There is no evidence he was induced by the Widders to provide the affidavit. Rather, he was fulfilling his obligation under the law.
 {¶ 111} In the attorney-client relationship, "the only materials protected are those which involve communications with his client's attorney." State v. Jergens (Sept. 3, 1993), Montgomery App. No. 13294, 1993 Ohio App. LEXIS 4322 at *21. Observations which may be made by anyone, therefore, do not qualify as attorney-client communications. Id.
 {¶ 112} In her reply brief below, Kutnick cited to a reference in the Widders' motion for summary judgment. This reference is to Peggy Widder's deposition, in which she offered the following explanation as to why she felt Kutnick needed a guardian: "I was aware of her living conditions. I was aware of difficulties she had had with the health department. I was aware that she wasn't taking her medications. I was aware that she wasn't able to separate reality from fantasy. I was aware that she was delusional. I had reason to believe that she was not able to maintain herself in a safe fashion." Deposition at 26. Peggy Widder did not make these statements, however, until after she had been sued by Kutnick for malpractice. Their revelation, therefore, arose solely as a defense to Kutnick's suit and does not qualify as confidences breached. Ward v. Graydon, Head Ritchey (2001), 147 Ohio App.3d 325, 330.
 {¶ 113} Neither in her motion for summary judgment nor her appellate brief does Kutnick cite to any portion of the guardianship hearing transcript itself, nor does she specify any confidential information which the Widders allegedly divulged in that proceeding. Instead, she makes a blanket statement that the Widders violated confidences.
 {¶ 114} Nor is there any disclosure of confidences in the initial guardianship application filled out by the Widders. The application states only: "She is unable to handle her personal or financial affairs." Ex. 22.
 {¶ 115} There is, therefore, no evidence to show that the Widders violated the duty of confidentiality to their client, either before or after their representation of her. There is, moreover, no specific evidence of other duties violated to make this a question of factual controversy.
 {¶ 116} The only transcripts in the record are of three Probate Court hearings, on September 14, 1994, on November 10, 1994, and March 29, 1995. In the September hearing, Widder declined to testify, citing attorney-client privilege. In the November hearing, the referee asked Mr. Widder, "Do you know the reasons that she was treated by Dr. Fisher, physical or mental?" Mr. Widder responded, "Well, Dr. Fisher is a psychiatrist, and I am a little leary [sic] of answering that question, Mr. Donahue, because I don't want to betray the attorney-client privilege." Tr. at 5. Mr. Widder again later raised the attorney-client privilege when he was questioned about the proceedings at Kutnick's competency hearing at Laurelwood Hospital. He stated: "Again, I have got problems with the attorney-client privilege because we were at that point still her attorneys." Tr. at 7. At the hearing, the Widders attempted to balance two different attorney-client obligations; maintaining a reasonably normal attorney-client relationship which would include following only the client's wishes, and taking a reasonably protective action to ensure the well-being of their client. The Model Rules described this as an "unavoidably difficult" task.
 {¶ 117} I would thus affirm the lower court.
[1] Proposed rules 1.1-1.6 were circulated for comment in January 2004; comments were accepted through April 2, 2004. In late April, the Task Force adopted the current form of this set of proposed rules. Once the Task Force recommendations are complete and submitted to the Supreme Court, the Supreme Court will publish the proposed rules for comment.
[2] Under R.C. 2111.031, costs are charged against either the ward or the applicant, unless the court for good cause shown charges them to the county. The applicant initially pays the costs and the expert witness's fee. If the guardianship is ruled to be warranted, the applicant may recover the cost of proceedings from the ward's estate. If the guardianship is denied, the applicant is liable for those costs.
[3] The record here shows, however, that an application for attorney fees from the indigent fund was granted. Ex. 21 of the guardianship case docket.